THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

```
CHRISTOPHER RUSH,              )
                               )
    Plaintiff,                 )
                               )
        v.                     )
                               )
BRAD DOUGLAS,                  )     No.  2:18-cv-0364
                               )          2:20-cv-00636
ALLISON BRYANT,                )
                               )
AN UNKNOWN NUMBER OF UNKNOWN   )
NAMED STAFF,                   )
                               )
SOUTH CENTRAL REGIONAL JAIL,   )
                               )
PRIMECARE MEDICAL, INC.,       )
                               )
    Defendants.                )
```

FILED SEP 2 3 2019 RORY L. PERRY II, CLERK U.S. District Court Southern District of West Virginia

COMPLAINT

~~SUPPLEMENTAL BRIEF~~

Plaintiff Christopher Rush now comes before the court to present this Supplemental Brief which gives additional information to supplement his complaint in his civil action under 28 U.S.C. §1983.

Christopher Rush 14667-088
Pro Se
Federal Correctional Complex
P.O. Box 1000
Petersburg VA 23804

I. FACTS

1. On October 17th, 2017, I was a detainee at South Central Regional Jail. I was working as a trustee between 1:30 AM and 2:00 AM, having been ordered to clean the walls in the female section and the section with inmates who were in trouble.

2. Deputy Allison Bryant approached me and asked me to step into the Rover Room, a room where staff members go. I complied.

3. While we were alone together in the room, she said, "show me what you're working which," which I interpred as an order to expose my genitalia.

4. I was nervous about being in a situation I had never experienced before, and so I asked Bryant to wait, left the Rover room, and headed up the hallway.

5. I encountered Corporal Vandel, who said, "Mr. Rush, it is lunch time. Stand over there to get your bag lunch," indicating the wall by the gym.

6. I looked back down the hallway and saw Bryant staring at the corporal and me having a conversation. She then walked the other way from us.

7. I received and ate my lunch. After I finished, I walked toward my housing unit to obtain a pen. I then walked to the cleaning closet for some cleaning supplies.

8. As I emerged from the cleaning closet, I was approached by a deputy, who said, "Mr. Rush, give me your trustee boots and return to your housing unit."

9. I asked him why. He replied, "You know what you did. You gave that girl $20 for some cigarettes." I asked, "What girl?" He answered, "Ms. Bryant."

10. I told him, "No, that is false. She asked me to show her my privates, and I walked up the hallway."

11. I then asked for the head shift supervisor. The deputy responded that the supervisor was the one who had told him to tell me to return to my housing unit.

12. I handed the deputy my trustee boots and went back to my housing unit.

13. Later that night, at about 2:00 AM on October 17, 2017, I submitted a grievance about the incident on the kiosk in my housing unit.

14. In the morning, around 9:00 or 10:00 AM on October 18, 2017, I saw a response on the kiosk from Captain Thompson, saying, "we will look into it." To the best of my knowledge, no further action was taken.

15  On the same date, October 17, 2017, at approximately 2:00 PM, I was called out of my unit for a visit. As I approached the front of the jail, where between six and eight deputies were standing, a man came out of what was labeled an attorney visiting room and punched me in the nose and mouth.

16. Captain Campbell held me back from defending myself and said, "Mr. Rush, just go to your visit."

17. My nose and mouth were bleeding so badly during this visit with my daughter and her mother that I cut my visit short.

18. A deputy was there to take me back to my housing unit. I told the deputy I wanted to speak to Captain Campbell or the administrator about this situation. He said they were busy right then but that he would let them know.

19. I returned to my housing unit and waited all day for someone to come and talk to me. No one came, and I did not receive medical attention for my injured nose and mouth.

20. I heard a rumor that the inmate who had punched me lived two housing units away from me in the same section. I decided I wanted to move to a unit in a different section to forestall further violence.

21. On October 18, 2017, between 4:30 AM and 5:30 AM, I pressed the intercom button and told the answering deputy I did not feel safe at my housing unit. I asked if someone could come back to get me. Nobody ever came.

22. When a deputy did his rounds of count, I followed him with my personal effects. I then walked to the front of the jail where I asked to speak with Corporal Roop, the shift supervisor.

23. I asked Corporal Roop to move me to the housing unit I had requested. He said, "No. You either get your stuff and move back to the unit, or you're going to the hole."

24. I asked, "Why? Because I don't feel safe back at my housing unit." He stated, "I don't care. I'm tired. You have two places you can go, and that is to your housing unit or to the hole."

25. I said, "That is cruel and unusual punishment." He replied, "Oh well, and as a matter of fact, the other shift can handle this, 'cause I'm going home." He kept me at the interview until the next shift came between 8:00 AM and 9:00 AM.

26. At the shift change, many deputies arrived, wearing uniforms indicating high rank. Corporal Roop told them I had refused to return to my housing unit.

27. I tried to talk to Captain Campbell, but he kept telling me to hold on.

28. I saw Mr. Leonard, a central office worker. I told him what had happened to me. He said he could not do anything and told me to write a grievance.

29. I told him I had, but no one had done anything to solve the problem. I had told him about how Bryant had sexually harrassed me and what her response was. I pointed out that the claim I had given her $20 was a patent and obvious lie, as inmates do not have access to cash money.

30. I asked him if they could do a full investigation. He then walked off.

31. Captain Thompson and another deputy then approached me and stated, "Mr. Rush, you are going to the hole for giving my deputy $20." I responded, "Before you put me in the hole, I want you to do a full investigation."

32. I then asked to speak with the administrator, whom I had seen in our presence. I was never allowed to speak with the adminstrator. Captain Thompson ordered the deputy to put me in the hole.

33. The deputy obtained my belongings from the hallway and placed me in the hole, upon information and belief in A-1 Room 12. The deputy then left.

34. I tried the intercom button in the cell several times, but nobody came. When a deputy eventually came by to deliver the mail, I told him the intercom button did not work. He said they would have to fix it.

35. That night, I was called from my cell to obtain my

medication. I told the nurse I felt as if I could not breathe. The nurse measured my blood pressure and said, "Mr. Rush, your blood pressure is high. Just make sure you take your meds, and if it gets worse, hit your intercom button." I told her the button did not work, and she left the unit.

36. On October 19, 2017, a deputy came to my cell to deliver breakfast. I told the deputy I was having difficulty breathing. The deputy told me to press the intercom button. I explained it did not work. The deputy left without checking on me.

37. On October 19, 2017, I underwent a sentencing hearing for the charge of giving Bryant $20. My arraigning officers were Deputy Kinder and Corporal Roop. Roop was the same deputy who refused to transfer me to safer housing and instead gave me the choice of my original housing unit or the hole.

38. At the hearing, Bryant made the false claim that I had given her $20. I was found guilty.

39. I appealed timely within the 15-day limit through Brad Douglas. I called for an investigation and pointed out that Bryant had lied at the hearing. Douglas denied my appeal.

40. Another day, I pressed the intercom button in the common area downstairs. I told the answering deputy I really needed to see a nurse because something was wrong with my breathing, and I was becoming dizzy and light-headed.

41. On this occasion, a nurse did come back and checked my blood pressure. She said it was high. She told the deputy I was having a really bad panic attack and told the deputy to let me get some fresh air. I never got any fresh air.

42. That evening, I left the cell to take a shower. I went to the kiosk and filed a grievance listing many of the events.

43. Later that evening, I had difficulty breathing while I was in my cell. I asked another inmate I saw outside in the common area to press the intercom button.

44. I saw and heard the other inmate press the intercom button. The staff who answered told the inmate they would send a deputy back with a nurse. Nobody ever showed up.

45. Bryant, who had sexually harassed me, was working in the A tower of the hole where I was held and interacted with inmates all night. One inmate was talking with Bryant for hours. I asked him to tell her it was time to let me out for my shower. I heard her tell the inmate, "I'm not letting Mr. Rush out because he tried to lie on me. So he's not coming out." I wrote this on a grievance later.

46. One day, my entire left side felt numb. I saw Deputy White outside the cell and yelled at him. He had me removed from the cell and sent me to medical.

47. At medical, the nurse checked my blood pressure but did not run an EKG or do any other diagnostic procedure. She simply administered the hypertension medication I was already taking, and I was returned to my cell.

48. One day in the hole, I was extremely short of breath. I remember waving a shirt out of the "bean hole," the slot through which they pass meals. I believe I lost consciousness, because I awoke on the floor of my cell.

49. About a week and a half later, the facility was locked

down as high-ranking officers examined every cell. I overheard from an officer who was distributing food say that Allison Bryant was involved with the escape of an inmate from South Central Regional Jail.

50. I was not let out on the fifteenth day as I had been told at the hearing. A day or two later, representatives of the Central Office came around and checked individually. I spoke to them and explained the situation.

51. I was let out of the hole on November 5, 2017. Upon information and belief, the Central Office arranged my release.

52. On November 8, 2017, after I returned from a pretrial motion hearing, I was walking down the hallway. As I was telling another detainee who was a family member what happened in court, someone struck me on the back of the head and then beat me into unconsciousness. The deputy moved very slowly in intervening. I was never checked for concussion or any other medical problem that may have resulted from this attack.

53. The next day, November 9, 2017, I saw my attorney, Brian Yost. He saw the swelling on my face, and I told him what happened.

54. I presented to the jail psychiatrist with anxiety and was prescribed Prozac.

55. On Thanksgiving Day, November 25, 2017, Deputy Keefer and an unknown deputy were passing trays to inmates. They let the same inmate who had assaulted and battered me into my housing unit.

Under penalty of perjury, I declare that the foregoing facts are true and correct to my knowledge.

_____       _____
Christopher Rush                 Date

## II. PHYSICAL AND EMOTIONAL DAMAGE AND SUFFERING

56. In addition to the physical injuries caused by and not treated as a result of deliberate indifference by the jail and its staff, I also suffer severe, lingering emotional and psychological damage.

57. As a result of the physical attacks and the deliberate indifference of jail staff to protect me and intervene appropriately, I have excessive suspicion and anxiety about people walking near me and am unable to trust staff and other authority figures.

58. The experience of numbness over my entire left side, not properly treated due to deliberate indifferance, has deeply traumatized me, and I live in constant fear. I have not been able to keep my blood pressure low due to obsessive thoughts.

59. I expect to require extra medication and a great deal of couseling and therapy for the remainder of my life upon release.

60. The treatment by Allison Bryant has affected my relationship with my fiancee adversely and has instilled in me a general mistrust of women. I find it impossible to have decent conversations with my fiancee and cannot imagine ever being able to have appropriate relationships and interaction with women or men.

61. I have become extremely uncomfortable and distrustful in situations where I am in a room alone with a woman, such as during medical visits here at the prison.

62. My confinement to the hole without proper medical treatment has resulted in extreme anxiety in confined situations and severe shortness of breath.

63. The medication prescribed when I presented for anxiety, Prozac, has caused serious side effects, including dizziness

and loss of memory. Physicians at the prison have discontinued the medication but say it will take two years before I have a chance to be free of symptoms.

64. At all times during the events described, PrimeCare Medical was responsible for supplying medical care to South Central Regional Jail. The extent of their involvement and responsibility for the events is unknown, and as a _pro se_ litigant, I am unable to obtain this information or information on the identities of most of the defendants without a chance for discovery, order to compel, or other remedy from this court.

Respectfully submitted this 17 day of September 2019,

_____
Christopher Rush